IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville December 18, 2018

**STATE OF TENNESSEE v. DERIUS PETTIS**

**Appeal from the Criminal Court for Shelby County**
**No. 11-04546     James C. Beasley, Jr., Judge**

——————————————————

**No. W2017-02473-CCA-R3-CD**

——————————————————

A Shelby County Criminal Court Jury convicted the Appellant, Derius Pettis, of one count of attempted voluntary manslaughter, a Class D felony; one count of employing a firearm during the attempt to commit a dangerous felony, a Class C felony; one count of reckless aggravated assault, a Class D felony; and three counts reckless endangerment, a Class E felony. After a sentencing hearing, he received an effective twenty-year sentence. On appeal, the Appellant contends that the evidence is insufficient to support the convictions and that the trial court erred by refusing to instruct the jury on duress and defense of a third person. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Barry W. Kuhn (on appeal) and Trent Hall (at trial), Memphis, Tennessee, for the appellant, Derius Pettis.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Stark and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In July 2011, the Shelby County Grand Jury indicted the Appellant and his codefendant, Christopher Swift, for the attempted first degree premeditated murder of

Robert Mull and employing a firearm during the attempt to commit a dangerous felony. The grand jury also indicted the Appellant alone for the following five offenses: aggravated assault with a deadly weapon and causing bodily injury to Andra Hubbard;[1] aggravated assault with a deadly weapon and causing bodily injury to Tony McCully; aggravated assault with a deadly weapon and causing bodily injury to Ladarrius Wright; aggravated assault with a deadly weapon and causing bodily injury to Deangelo Jones; and the reckless endangerment of Hubbard, McCully, Wright, and Jones. The record reflects that the reckless endangerment charge was nolle prosequied.

The Appellant and Swift were tried jointly. At trial, Gary Meador testified that in December 2010, he was an officer with the Memphis Police Department (MPD). About 2:00 a.m. on December 12, Officer Meador and his partner, Officer Bryan Flacco, were traveling west on Jackson Avenue when they saw "a mass exodus coming from the parking lot of the Boss Club." Officer Meador said that people were running out of the nightclub and that cars were driving out of the parking lot "as fast as they could get out." The officers pulled into the parking lot, and someone told them that a shooting had occurred. Officers Meador and Flacco went to the front entrance of the club and found a man who had been shot. They tried to stop people in the club and parking lot from leaving until backup could arrive. Other officers later found four additional shooting victims: two in the parking lot, one on Alaska Street, and one at the hospital.

On cross-examination, Officer Meador estimated that he and Officer Flacco arrived at the scene within a few minutes of the shooting because people were still running out of the club. He said that the club was "not a very big place" and acknowledged that it was about the size of the courtroom. He also acknowledged that he and Officer Flacco were unable to stop everyone from leaving the scene. They found one of the victims lying just inside the entrance to the club and stayed with him until medical personnel arrived. Officer Meador did not go further inside the building. He acknowledged that officers found Robert Mull's Ford Explorer in the parking lot and that the driver's door was open.

Ladarrius Wright testified that on December 12, 2010, he was at the Boss Club and was standing near the front door with Tony McCully when a couple of people began fighting. Wright saw someone "[throw] a punch" and heard five to ten gunshots "coming from like the back of the club in the middle." He was shot eight times: four times in the left arm, twice in the chest, and twice in the leg. Regina Hurd took Wright to the hospital, and they left the club as the police were pulling into the parking lot. Wright stated that he was not trying to avoid the police but that he was trying to get medical

---

[1] Count two of the indictment charged the Appellant with the aggravated assault of Andre Hubbard. However, Hubbard testified at trial that his first name was "Andra."

attention. He said he saw the person who shot him, and he identified that person at trial as the Appellant.

Wright testified that on December 14, the police showed him numerous six-photograph arrays. On the first array, Wright circled a photograph, identified the man as Chris Brown, and wrote that Brown was one of the people fighting. Wright stated that he did not know Brown or Brown's name prior to the shooting but that he learned Brown's name because "[a]ll the people were talking saying his name." On the second array, Wright circled a photograph, identified the man as "Duke," and wrote that Duke bumped into Tony McCully. Duke's real name turned out to be Kendrick Gray, and Wright said Gray bumped into McCully "really hard." On the third array, Wright circled Tony Christian's photograph and wrote that Christian was fighting with Tony McCully. On the fourth array, Wright circled a photograph, identified the man as "Jerry Lawyer," and wrote that the man was standing outside the club. Wright identified Jerry Lawyer at trial as codefendant Swift. Wright said he did not know Swift's name prior to the shooting but heard other people referring to Swift by his nickname, Jerry Lawyer, after the shooting. On the fifth array, Wright circled a photograph, identified the man as "Dee Dee," and wrote that Dee Dee shot him. Wright identified Dee Dee at trial as the Appellant.

On cross-examination, Wright testified he had never met the Appellant prior to December 12. He described the nightclub as a "hole in the wall" and said that it was a "little smaller" than the courtroom. Patrons were patted down for weapons before they entered the club, and "a lot" of people were in the club on December 12. Wright went to the club with Hurd and had been there two to three hours when the shooting occurred. He explained that he was standing at the entrance with McCully when Gray bumped into McCully. Christian then hit McCully, the entire crowd started fighting, and the Appellant started shooting. Wright said the Appellant was the only person he saw shooting inside the club.

Tony McCully testified that he went to the Boss Club on December 12, 2010. At some point, "the whole club just got quiet." McCully saw Robert "Ra Ra" Mull enter the club and told Mull, "'I got a bad feeling. We got to go. I don't feel safe where I'm at. It's too quiet and it's too many people in the club for the club to be quiet like it was some planning going on.'" McCully said he and Mull were standing by the front door and near a security guard when he saw Kendrick Gray come toward them. Gray said something to Mull and then "jumped backwards" toward McCully and Mull "like you jump in the crowd and they catch you." McCully and Mull pushed Gray, and McCully "got to fighting" with Tony Christian. McCully saw shots fired, tried to get onto the ground, and heard the security guard say, "'I'm shot. I can't move. I can't move.'" McCully tried to help the security guard get up, ran out of the club, and saw that Deangelo Jones had been

shot in the wrist. McCully began looking for Mull and found him lying in the parking lot. Mull was ten to twenty feet from Mull's Ford Explorer and could not breathe. McCully said that the shooting happened "fast" and that "I think it was like just a punch and boom." When the police arrived, McCully realized he had been shot in his left elbow.

McCully testified that two days after the shooting, the police showed him two six-photograph arrays. On the first array, McCully circled Chris Brown's photograph and wrote that he saw Brown in the crowd. On the second array, McCully circled Gray's photograph and wrote that Gray started the fight. McCully identified a photograph of a group of men taken at the club on the night of the shooting, and he identified one of the men in the photograph as Tony Christian.

On cross-examination, McCully testified that the club was "[v]ery small" and that thirty to forty people were in the club at the time of the shooting. He said that the club's employees "did a pretty good search" of patrons who entered the club and that he thought the club was safe. McCully acknowledged that Gray and Mull "exchanged words" and said that they "tussle[d]" before the shooting. However, "no punches [were] thrown." McCully started fighting with Christian and heard a gunshot. He said that Mull did not have a gun inside the club and that he did not see who shot Mull. McCully acknowledged that he did not know who shot him in the elbow.

Andra Hubbard testified that on December 12, 2010, he was working as a "bouncer" at the Boss Club and was responsible for "patting down, searching" patrons at the front door. He said that he had worked at the club for seven years; that codefendant Swift was a regular customer; and that he knew Swift by his nickname, Jerry Lawyer. Hubbard also knew the Appellant. The Appellant and Swift were at the club on December 12.

Hubbard testified that about 2:30 a.m., someone told him that "'they in there fighting.'" Hubbard said he looked in the club, saw the "O.K. Corral," and took two steps inside to break up the fight. He heard two gunshots in the west side of the building and thought to himself, "'Wow. Somebody got a gun in there.'" Hubbard turned around to go out so he could call 911 and heard a third gunshot. He fell to the ground and realized he had been shot. His legs were "burning," and he could not move them. People started running out of the club, and Hubbard had to crawl out of the way so they did not trample him. A man hiding underneath a table tried to help Hubbard. Hubbard was shot three times and spent eight months in the hospital.

On cross-examination, Hubbard testified that the capacity of the club was about 150 people, that more than 150 people were in the club that night, and that Swift was

- 4 -

there with the Appellant. When Hubbard went into the club to stop the fight, he saw four or more people "brawling."

Deangelo Jones testified that when he arrived at the Boss Club on December 12, he saw Chris Brown and Kendrick Gray wearing black clothing and "passing [three or four] guns over the back fence." Jones and Robert Mull then went into the club together. About twenty minutes later, they were standing at the front door with Tony McCully when a fight "broke out." Jones looked into the crowd, "seen a dude with all black on with a gun pointing," and thought his life was in danger. He heard a gunshot to his right and saw "fire jump out that gun." He ran out of the club, and Darenta Hearns picked him up on Jackson Avenue. Jones saw blood on his jacket sleeve and discovered he had been shot in his left wrist. Hearns took him to Alaska Street, and an ambulance transported him to a hospital.

Jones testified that Tony Christian was fighting before the shooting but that he did not see Brown or Gray fighting. On the afternoon of December 12, the police showed Jones two group photographs that were taken inside the club before the shooting. On one of the photographs, Jones circled Christian and wrote that Christian started the fight with Gray. On the other group photograph, Jones circled two men and identified them as Gray and Brown. The police also showed Jones several six-photograph arrays. On one of the arrays, Jones circled Brown's photograph and wrote that Brown was "one of the shooter[s]." Jones explained to the jury, "I didn't mean to say it like he was actually shooting, but he was responsible for the guns getting in the club."

On cross-examination, Jones testified that Brown was passing the guns over the fence to Gray and that two or three men were with Gray. However, Gray was the only person receiving the guns from Brown. Jones entered the front of the club and was patted down. Although he had just seen guns being taken into the back of the club, he did not think he was in danger. Jones heard several gunshots before he ran out of the club. He continued to hear gunshots and estimated that he heard a total of forty to forty-five shots. He acknowledged giving a statement to police in which he said he thought the gun pointed and fired at him was a forty-caliber gun. He also acknowledged saying in his statement that Brown and Gray were "responsible" for shooting him and that Brown was "the shooter." Jones told the jury that Brown and Gray did not shoot him and that he did not see the shooter's face. He told the police that Brown and Gray were "responsible" for the shooting because they were responsible for the guns being in the club. He said he wrote on the array that Brown was the shooter because Sergeant Thomas Manns told him "what to put down on the paper."

Robert Mull testified that on December 12, 2010, he was at the Boss Club but was getting ready to leave because he was "feeling something was going to happen." He said

that before he could leave the club, "they surrounded us," "a fight broke out," and "they started [firing] gunshots." Mull ran out the front door, and someone chased and shot at him. Mull ran to his Ford Explorer to get his gun out of the center console and opened the driver's door. He "saw [the shooter] coming back up" and "took off running again." Mull ran toward the back of the club and was "shot down." A second shooter "stayed on top of [him]" and shot him three times. Mull was in the hospital for three months followed by one month of rehabilitation.

Mull testified that on the afternoon of December 12, the police showed him several six-photograph arrays. On one of the arrays, Mull circled codefendant Swift's photograph and wrote that Swift was one of the men who shot him outside the club. On another array, Mull circled the Appellant's photograph and identified him as "the second person" who shot him outside. Mull told the jury that he had seen the Appellant and Swift "around the neighborhood" prior to December 12 and that he knew them as Dee Dee and Lawyer.

On cross-examination, Mull testified that he had been at the club about one hour when the fight started. He said that he did not see who was involved in the fight, that he did not see Tony Christian and Tony McCully fighting, and that he never pulled a gun. Doctors told him that he had been shot eight times.

Darenta Hearns testified that on December 12, 2010, he dropped off his cousin, Deangelo Jones, at the Boss Club. About 2:00 a.m., Hearns drove back to the Boss Club to pick up Jones. Hearns said he "pulled to the back of the club" and waited in his car for Jones to come outside. While he was waiting, he "saw some guys putting some guns over the fence" behind the club. He stated, "They were taking them out of a car and they was handing them over the fence to some guys that was standing in the back of the Boss Club where the back door was at and they were taking them in." Hearns saw about five guns and six or seven men, and he thought the men were security guards because all of them were dressed in black clothing. After the men took the guns into the club, Hearns heard five or six gunshots and saw people running out of the front of the club. He then saw "one guy running" and "like two or three other guys chasing him" in the parking lot. The man ran to a Ford Explorer, opened the driver's door, and tried to get into the vehicle. Hearns said that the man "saw the guys coming for him," that the man ran away from the Explorer, and that "that's when they got him." One of the men in the group shot the man, and the man fell to the ground. The men in the group then shot him in his back five or six times.

Hearns testified that he put his car into reverse and tried to get out of the parking lot as fast as he could but that he backed into a tree. He drove across the street and parked on Jackson Avenue to wait for Jones. Jones came out of the club and had been

shot in the arm. Hearns drove Jones to Hearns's brother's house on Alaska Street, and Hearns's brother telephoned the police.

On cross-examination, Hearns testified that the guns being passed over the fence "looked like some nines or some four-fives." He said that after the man ran away from the Explorer, one of the men in the group shot the man. The man fell to the ground, and "two or three" more men shot him after he fell. Hearns said the shooters "were in black" and "had the same outfits on." The police showed Hearns a photograph of a group of men taken at the club on the night of the shooting, and he circled one of the men and wrote on the photograph, "'This is the guy that shot Rod Rod.'"[2] In the photograph, the man was wearing blue jeans, a blue shirt, and a sky-blue bandana.

On redirect examination, Hearns testified that he did not remember much about the shooting and acknowledged that he did not remember who he circled in the group photograph. He said, though, that he remembered one man chasing another man out of the club and shooting the man one time in the back. After the man fell to the ground, the shooter "shot him numerous more times." On recross-examination, Hearns testified that he did not know Robert Mull prior to the shooting.

Deterrius Jones, Deangelo Jones's older brother, testified that in the early morning hours of December 12, 2010, he rode to the Boss Club with Darenta Hearns and waited with Hearns in Hearns's car. While they were waiting, Deterrius[3] witnessed a shooting in the parking lot. Deterrius stated, "Two guys was running out the club. One was chasing another one and shooting at the same time." The man who was being chased "[ran] toward his car to get protection" and "couldn't make it so he ran past the car." The man fell to the ground, and the shooter walked up to him, shot him two or three more times, and ran away. After the shooting, Hearns "sped off." Hearns later picked up Deangelo and drove him to Alaska Street. Deangelo had been shot in the wrist.

On cross-examination, Deterrius testified that before the shooting, he saw three or four men "passing [handguns] over the fence" and "putting them in the club." The men were wearing black clothing. The police showed Deterrius a six-photograph array, but he was unable to identify anyone. On redirect examination, Deterrius acknowledged that the shooter in the parking lot was wearing "all black." He also acknowledged giving a statement to police in which he said the shooter was African-American; five feet, eleven inches tall; "kind of thin"; dark complected; and nineteen or twenty years old.

---

[2] "Rod Rod" was actually Robert "Ra Ra" Mull.
[3] Because the witness and victim Deangelo Jones share a surname, we will refer to them by their first names briefly for clarity. We mean no disrespect to Deterrius or Deangelo Jones.

James Demesma, Darenta Hearns's brother, testified that on December 12, 2010, he rode to the Boss Club with Hearns and Deterrius Jones. They got there about 1:00 a.m. and were "getting ready to park." Demesma saw two people outside the fence passing guns to a person inside the fence. Thereafter, "shooting started happening" inside the club. Hearns tried to drive out of the parking lot but backed into a tree. Demesma stated, "That's when the shooter start coming outside the club. And that's when I seen, I don't know his name, he got shot in the parking lot." The man fell, and the shooter shot him three more times in the back. Demesma said no one was standing near the shooter.

Demesma testified that as Hearns was driving away from the club, Demesma saw another man with a gun walking away from the club. Hearns parked across the street from the Boss Club, and Deangelo Jones called and said he had been shot. Deangelo Jones ran to Hearns's car and was holding his arm. Someone in the car telephoned the police, Hearns drove to Demesma's house on Alaska Street, and the police and paramedics were waiting for them when they arrived. The police showed Demesma the same two group photographs that the police showed to Deangelo Jones. On the first photograph, Demesma circled Tony Christian and wrote that Christian was the person who walked out of the club with the gun. On the second group photograph, Demesma circled the man Deangelo Jones had identified as Chris Brown and wrote that Brown looked like "the guy" who was shooting in the parking lot. However, Demesma was not one hundred percent sure about his identification.

On cross-examination, Demesma testified that he saw at least three guns passed over the fence. One was a chrome forty-caliber gun, and one was a black thirty-eight caliber gun. After the shooter shot the man on the ground, the shooter jumped into a truck and drove away. The man with the gun who walked away from the club after the shooting left in a white Impala.

Officer Christopher Sanders of the MPD testified that he went to the Boss Club on December 12, 2010, to photograph the scene and collect evidence. He also prepared diagrams of the crime scene. Officer Sanders found four spent shell casings and one bullet slug inside the club and photographed four bullet holes in the walls of the club. He found five spent shell casings in the parking lot.

Officer Eric Carlisle of the MPD testified that on December 20, 2010, he searched Robert Mull's Ford Explorer and found a semiautomatic handgun in the center console. The gun was fully loaded with one live round in the chamber and ten rounds in the magazine.

Cervinia Braswell, a special agent forensic scientist with the Tennessee Bureau of Investigation's Firearms Identification Unit, testified as an expert in firearms and tool mark identification that she received the handgun found in Robert Mull's Ford Explorer; the gun's magazine; and eleven, forty-caliber unfired cartridges for analysis. The gun was a forty-caliber pistol. Braswell was able to test-fire the pistol, but the gun did not function properly because "its natural safety wasn't working." Agent Braswell also received nine nine-millimeter fired cartridges cases and one nine-millimeter fired bullet for analysis. The nine-millimeter cartridge cases could not have been fired from the forty-caliber pistol. However, Agent Braswell determined that all nine cartridge cases were fired from the same unknown gun. On cross-examination, Agent Braswell acknowledged that the nine-millimeter bullet may have been fired from the same gun as the nine-millimeter cartridges cases.

Sergeant Thomas Manns of the MPD testified that he was the case investigator for the Boss Club shooting. After the shooting, Deangelo Jones gave a statement to someone in the Felony Response Unit. Jones said in his statement and wrote on a "photo spread" that Chris Brown and Kendrick Gray were "responsible" for the shooting. Sergeant Manns wanted to clarify what Jones meant by "responsible," so he telephoned Jones. Jones told Sergeant Manns that he "felt that [Brown and Gray] were responsible because they supplied the guns that were used in the shooting." Based on Jones's information, Sergeant Manns began trying to locate Brown and Gray so he could interview them.

Sergeant Manns testified that the Appellant "showed up" at the police department and wanted to speak with an investigator. Sergeant Manns had the Appellant read an advice of rights form, the Appellant signed the form, and the Appellant agreed to speak with him. The Appellant gave a statement, which Sergeant Manns read to the jury.

In his statement, the Appellant said that even though he was searched when he entered the club, his gun was in his pocket. The incident inside the club started when Kendrick Gray "tried to get off the stage and he started going over like he was falling." Tony McCully pushed Gray, and the Appellant's brother, Tony Christian, hit McCully in the jaw. Christian and McCully began fighting, and Robert "Ra Ra" Mull pulled out a gun. The Appellant started shooting toward Mull. The Appellant said that he fired two to four times at Mull and that he thought he "hit" Mull. Mull ran out of the club, and the Appellant ran after him. When the Appellant got outside, he saw Mull putting a key into the door of an Explorer. Mull opened the door, turned around, and they "met up" in the parking lot. The Appellant stated, "Ra Ra said I was dead. Then I shot him again." The Appellant said that he must have fired three shots at Mull outside the club because his gun was loaded with nine cartridges prior to the shooting and two cartridges remained in the gun after the shooting. The Appellant ran on Jackson Avenue and threw his gun, a black nine-millimeter High Point, over a fence. The Appellant saw someone else in the

club with a gun, but he did not know if anyone other than he fired a gun inside the club. After he chased Mull out of the club, though, he heard five more gunshots inside.

Sergeant Manns testified that he spoke with codefendant Swift on January 27, 2011. Swift waived his rights and gave a statement. In his statement, Swift said as follows:

> I got there at like 11:00. I smoked some weed. Then we took pictures. Then Ra Ra, Tony and them got into it with Duke and Dee Dee by the stage.
>
> Tony pushed Duke then a brawl happened. Then I heard about four shots in the club. So I run outside. Then I went to Hughes Club with my brother.

Sergeant Manns asked Swift how much marijuana he smoked, and Swift answered, "Seven blunts." Swift said that after he ran outside, "I saw him shoot at him, but I don't know if he was shot or not." Sergeant Manns asked Swift to "[d]escribe the gun used to shoot [Mull]," and Swift said the gun was black. Swift did not see anyone with a weapon inside the Boss Club, and he not have a weapon inside the club. He stated that he could not see who was shooting inside the club and that he did not shoot at anyone. Swift left the club with his brother, Dominique Yates. Yates was driving a white Lexus.

On cross-examination Sergeant Manns testified that he did not think Brown and Gray were charged with a crime. He said they were not charged with bringing guns into the club because he "had no way to prove it other than just [Deangelo Jones]." He acknowledged that the Appellant came to the police department voluntarily on the day of the shooting and that the Appellant was cooperative. Sergeant Manns had officers search for the Appellant's gun, but they never found it. He acknowledged that seven "blunts" was a lot of marijuana. At the conclusion of Sergeant Manns's testimony, the State rested its case.

Tony Christian, the Appellant's older brother, testified for the Appellant that on December 12, 2010, he was at the Boss Club. The Appellant arrived at the club after Christian. Christian said that the club was small and that it was crowded that night.

Christian testified that he was "buck jumping, dancing" and that he and Tony McCully bumped into each other. Christian punched McCully, and they got into a fist fight with six to eight punches thrown. As Christian was fighting McCully, Christian looked to his left and saw Robert Mull point a gun at him. Christian "hit the floor to keep from getting shot" and used McCully as a shield by pulling McCully on top of him.

- 10 -

Christian heard fifteen to twenty gunshots.  He said that he did not see where the gunshots came from, that he was not armed, and that he did not see the Appellant fire a gun.  When the gunshots stopped, Christian ran out of the club to his sister's house.  Five days later, he heard about a warrant for his arrest and went to the police department.  Christian talked with the police and was allowed to leave.  He talked with the Appellant and convinced the Appellant to turn himself in to the police.

On cross-examination, Christian testified that he did not see anyone other than Mull with a gun and that he did not see anything happen in the parking lot when he left the club.  On cross-examination by the State, Christian acknowledged that he and the Appellant were friends with Swift and Chris Brown.  A fence was behind the Boss Club, but Christian never went behind the club.  He denied that Brown and Kendrick Gray passed guns into the club.  Christian acknowledged that patrons of the club were patted down "pretty good" before they entered the club and said that he did not see the Appellant with a gun.  Although Christian saw Mull with a gun, he did not see Mull fire the gun.  Christian denied seeing the Appellant, Brown, and Gray shooting inside the club.  He said he heard "some shooting outside" but "didn't know if it was [in] the parking lot or not."  He denied seeing the Appellant chase and shoot Mull in the parking lot and denied seeing Swift grab the gun from the Appellant and shoot Mull as Mull was on the ground.  Christian said he talked with the police on December 17 or 18.  At that point, the State showed him his written statement, and he acknowledged that he gave his statement on December 14.

Codefendant Swift did not present any proof, and the jury acquitted him of the attempted first degree premeditated murder of Robert Mull and employing a firearm during the commission of a dangerous felony.  The jury convicted the Appellant of attempted voluntary manslaughter as a lesser-included offense of the attempted first degree premeditated murder of Mull and employing a firearm during the attempt to commit voluntary manslaughter.  The jury also convicted him as follows:  reckless aggravated assault with a deadly weapon and causing bodily injury as a lesser-included offense of the aggravated assault of Andra Hubbard; reckless endangerment with a deadly weapon as a lesser-included offense of the aggravated assault of Tony McCully; reckless endangerment with a deadly weapon as a lesser-included offense of the aggravated assault of Ladarrius Wright; and reckless endangerment with a deadly weapon as a lesser-included offense of the aggravated assault of Deangelo Jones.

After a sentencing hearing, the trial court sentenced the Appellant to four years for attempted voluntary manslaughter, a Class D felony; six years for employing a firearm during the commission of a dangerous felony, a Class C felony; four years for reckless aggravated assault, a Class D felony; and two years for each count of reckless

endangerment, a Class E felony. The trial court ordered that the Appellant serve the sentences consecutively for a total effective sentence of twenty years.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support his conviction for the attempted voluntary manslaughter of Robert Mull and, therefore, insufficient to support his conviction of employing a firearm during the attempt to commit voluntary manslaughter. He also contends that the evidence is insufficient to support his convictions for the reckless aggravated assault of Andra Hubbard, the reckless endangerment of Tony McCully, and the reckless endangerment of Deangelo Jones. The State argues that the evidence is sufficient to support the convictions. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v.

<u>Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)).

1. Attempted Voluntary Manslaughter and Employing a Firearm

The Appellant contends that the evidence is insufficient to support his conviction of attempted voluntary manslaughter and, therefore, insufficient to support his conviction of employing a firearm because it fails to show that he shot Mull in a state of passion produced by adequate provocation. He notes that according to Mull's testimony, the shooter chased Mull into the parking lot and shot him several times; however, Mull did not do anything to provoke the shooter. Likewise, the Appellant told Sergeant Manns that he followed Mull to Mull's Explorer and shot Mull; however, nothing indicates that the Appellant was acting in a state of passion when he did so.

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Relevant to this case, a person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

Taken in the light most favorable to the State, the evidence shows that in the early morning hours of December 12, 2010, Tony McCully and Robert Mull were standing near the Boss Club entrance when Kendrick Gray bumped into McCully. McCully and Mull pushed Gray, and Tony Christian hit McCully's jaw. Christian and McCully began fighting, which resulted in the crowd fighting. The Appellant saw his brother, Christian, in the fight, pulled out his gun, and shot toward McCully and Mull, striking McCully in the elbow. Mull, who was unarmed, ran outside to get his gun out of his Explorer, and the Appellant chased him into the parking lot. The Appellant caught up to Mull after Mull opened the door of his Explorer but before Mull could get his gun out of the center console. Mull began running away from the Explorer, the Appellant shot Mull in the back, and Mull fell. The Appellant then stood over Mull and shot him several more times as he was lying on the ground. The jury obviously concluded that the fight between the Appellant's brother and McCully created adequate provocation to support the Appellant's conviction of attempted voluntary manslaughter, and we will not second-guess the jury's decision. Given that the evidence is sufficient to support the attempted voluntary manslaughter conviction, the Appellant's argument regarding his conviction of employing a firearm is without merit.

2. Reckless Aggravated Assault and Reckless Endangerment

The Appellant contends that the evidence is insufficient to support his convictions for the reckless aggravated assault of Andra Hubbard and the reckless endangerment of Tony McCully and Deangelo Jones because the victims did not identify him as the person who shot them. We disagree with the Appellant.

Relevant to this case, reckless aggravated assault occurs when a person recklessly causes bodily injury to another and uses or displays a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(1)(B)(iii). Felony reckless endangerment occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-103(a), (b)(2). Tennessee Code Annotated section 39-11-302(c) provides:

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c). A firearm is a "deadly weapon." Tenn. Code Ann. § 39-11-106(a)(5)(A).

Turning to the instant case, the evidence established that the Boss Club was very small, that the club was crowded on December 12, 2010, and that the three victims were standing near the front entrance at the time of the shooting. Officer Sanders found nine nine-millimeter cartridge cases at the scene, four inside the club and five in the parking lot, and Special Agent Braswell concluded that all nine were fired from the same unknown nine-millimeter gun. Ladarrius Wright, who also was standing near the entrance, was shot multiple times. He testified that he saw the Appellant shoot him and that the Appellant was the only person he saw firing a weapon.[4] Hubbard testified that he heard two gunshots, turned to go out the front door, heard a third gunshot, and fell to the ground because he had been shot. McCully testified that as soon as he heard gunshots, he tried to get onto the ground to avoid being shot. He ran out of the club and discovered he

---

[4] We note that the Appellant is not challenging his conviction for the reckless endangerment of Wright.

- 14 -

had been shot in his elbow. Likewise, Jones ran out of the club when he heard the gunshots and discovered he had been shot in his wrist. The Appellant told Sergeant Manns that he fired his gun, a nine-millimeter High Point, two to four times inside the club. From all this proof, a reasonable jury could have concluded that the Appellant recklessly caused bodily injury to Hubbard while using or displaying a deadly weapon and that he recklessly engaged in conduct that placed McCully and Jones in imminent danger of death or serious bodily injury while using or displaying a deadly weapon. Accordingly, the evidence is sufficient to support the convictions.

## B. Jury Instructions

The Appellant contends that the trial court erred by refusing to instruct the jury on duress and defense of a third person with regard to the charge of the attempted first degree premeditated murder of Robert Mull because "[t]he testimony relevant to this charge is that the defendant saw Mull pull out a gun after a fight started between the defendant's brother, Tony Christian, and another man." The State argues that the trial court properly refused to give the instructions. We agree with the State.

The Appellant was tried from August 28, 2017, to September 1, 2017. On the fourth day of trial, he filed a motion requesting that the trial court give the pattern jury instructions on duress, self-defense, and defense of a third person. The trial transcript reflects that the trial court and the parties discussed the jury charge that same day. The trial court granted the Appellant's motion in part, writing on the motion, "Granted as to Self Defense Denied Duress & Def of Third Person." The jury charge confirms that the trial court instructed the jury on self-defense but not duress and defense of a third person.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Duress is a general defense to prosecution

> where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

- 15 -

Tenn. Code Ann. § 39-11-504(a). The defense of duress is unavailable "to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion." Tenn. Code Ann. § 39-11-504(b). "This rare defense is present when a defendant commits an offense because another person threatens death or serious bodily injury if the offense is not committed." Tenn. Code Ann. § 39-11-504, Sentencing Comm'n Cmts.

Defense of a third person also is a general defense to prosecution when

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612. Tennessee Code Annotated section 39-11-611, the self-defense statute, provides that:

a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2).

- 16 -

A trial court does not need to submit general defenses to the jury unless they are "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c). When admissible evidence fairly raises a general defense, the trial court is required to submit the general defense to the jury even without a request from the defense. State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013). "To determine if a defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that may be drawn therefrom." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007). "From that point, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply." Hawkins, 406 S.W.3d at 129. We review the trial court's instructions to the jury de novo, with no presumption of correctness.

Initially, we note that the Appellant has risked waiving this issue because he failed to include the discussion about the jury instructions, which would have included the discussion about the requested instructions, in the appellate record. It is an appellant's duty to provide a record that is sufficient "to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). When the transcript of the proceedings relevant to the issue presented for review is not included in the record, this court is precluded from considering the issue. State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). In the absence of an adequate record on appeal, we must presume that the trial court correctly ruled upon the issue. Id. That said, the trial court addressed the issue at the hearing on the Appellant's motion for new trial and concluded that it properly refused to give the requested instructions. Therefore, we will review the issue.

The trial court found at the motion for new trial hearing that a group of men, one of whom was the Appellant, smuggled guns into the back of the club and was planning or anticipating "some type of an incident." As the court recalled, the Appellant was the only person inside the club who was seen pulling a gun and firing inside the club. The court found that the Appellant then pursued Mull outside and shot him several times as he was lying on the ground. Based on this evidence, the court ruled that nothing indicated the Appellant was acting under duress or in defense of a third person when he shot the victim.

We agree with the trial court that the evidence did not warrant the requested jury instructions for the charge of attempted first degree premediated murder. Granted, the Appellant told Sergeant Manns that Mull pulled a gun during the fight between the Appellant's brother and Tony McCully. Moreover, the Appellant's brother testified that he saw Mull pull a gun and point it at him during the fight. However, the Appellant was not charged with the attempted first degree premediated murder of Mull because he shot at Mull inside the club. Instead, the Appellant and Swift were charged jointly for the

- 17 -

attempted first degree premeditated murder of Mull because the State's theory of the case was that they chased Mull into the parking lot after the shooting inside the club; the Appellant shot Mull in his back as Mull was running away from his Explorer; and the Appellant, Swift, or both of them stood over Mull and shot him multiple times as he was lying on the ground. By that time, though, the Appellant's brother obviously was no longer in imminent danger of death or serious bodily injury by Mull. Thus, the trial court did not err by refusing to instruct the jury on the defenses of duress and defense of a third person.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE